Poe v. The State.

## John and Cicero Poe v. The State.

1. CRIMINAL LAW. *Change of venue.* The discretion of the trial judge in acting upon an application in a criminal case for a change of venue, will not be revised by this court except in a clear case of abuse of that discretion.

2. SAME. *Discretion of trial judge whether prisoner shall be manacled during trial.* Whether a prisoner should be free from shackles during his trial or restrained by manacles with a view to prevent escape, must be left to the discretion of the trial judge, and this court will not revise his action except in a clear case of the abuse of that discretion.

3. SAME. *Charge of court. Stolen goods. Possession of.* Where the prisoner is being tried for the crime of murder in the first degree because committed in the perpetration of a larceny, it is not error to charge the jury that the finding soon thereafter of the stolen goods in the prisoner's possession, if unexplained, would be a strong circumstance to show him to be the party guilty of the theft, and that if it be in the power of the accused to explain the possession and he fail to do so, the fact would intensify and make the evidence of guilty possession stronger.

43—VOL. 10.

4. SAME. *Evidence.* If it be shown that riding animals of a particular description were seen at the place of the murder at the time, it is competent to prove that such animals were owned in the neighborhood of the accused, and kept in such a way as to be accessible to them, and to prove by the owner of one of these animals that when he used it for the first time after the murder he noticed that the animal seemed stiff and jaded, and did not travel as free as usual.

5. SAME. *Mitigating circumstances.* The finding by a jury in their verdict of mitigating circumstances, although not binding on the court, is entitled to grave consideration, and ought to prevail in commuting the sentence from death to imprisonment for life, in a case of circumstantial evidence, if supplemented by the oath of a majority of the jury that they would not have agreed to the verdict if they had not been led to believe that the finding of mitigating circumstances would compel the court to commute.

FROM FRANKLIN.

Appeal in error from the Circuit Court of Franklin county. J. J. WILLIAMS, J.

SIMMONS & CURTIS for Poe.

A. S. MARKS and ATTORNEY-GENERAL LEA for The State.

COOPER, J., delivered the opinion of the court.

The prisoners were convicted of murder in the first degree, and sentenced one of them to death, and the other to imprisonment for life, and appealed in error.

The first error relied on is in the action of the circuit court in refusing the application of the prisoners for a change of venue. By the act of 1875, ch. 6, it is left "to the sound discretion of the court" whether there shall be a change of venue. And the discretion of the trial judge, we have repeatedly held,

will not be revised except in a clear case of abuse of that discretion: *Holcomb* v. *The State*, 8 Lea, 417; *Porter* v. *The State*, 3 Lea, 476. The application for a change of venue in this case, as in the first of the cases cited, was supported by the affidavits of the prisoners and of five other persons. On the other hand, the State called witnesses to show that there was no undue excitement against the prisoners until the trial judge suggested that any additional testimony would be merely cumulative. And the correctness of the ruling of the judge is evidenced by the fact that a jury was obtained without much delay, and a trial had without any exhibition of popular excitement. When the prisoners were first arrested in February, 1881, the people living in the vicinity of the place where the crime was committed were inflamed against the prisoners, and mob violence was threatened. Under these circumstances the prisoners were entitled to a continuance because of the undue excitement, as held by this court upon appeal from the judgment rendered against them: *Poe* v. *The State*, 8 Lea, 647. Nothing of the kind occurred, or appears to have existed at the time of the second trial. All excitement had died out, a jury was readily empanelled, the witnesses on both sides introduced and examined, and a verdict rendered in the usual way. The bill of exceptions fails to show any abuse of discretion by the trial judge in refusing to change the venue.

The prisoners were brought by the sheriff to the bar for trial manacled together by the right wrist of one of them being linked by a light chain to the left

wrist of the other.    After the first witness for the
State had been examined, and the second witness put
upon the stand, the prisoners, by their attorney, moved
the court for an order on the sheriff to remove the
manacles while the prisoners were in open court before
the jury, upon the ground that it was an unlawful
restraint upon the prisoners, and prejudicial to their
rights while on trial to be thus manacled.    The trial
judge declined to make the order, and this is assigned
as error.

When the motion for the removal of the manacles
was made by the prisoners, the district attorney-general
not only made no objection, but stated that he was
willing and would consent that the shackles be removed.
The trial judge declined to make the order asked for.
His Honor said the prisoners had demeaned themselves
with propriety before the court, and the fact that they
were manacled should not operate against them, but
the loose manner in which they were guarded required
either the manacles, or some more stringent orders to
the guards which would be equally unpleasant to the
prisoners.    His Honor further says in the bill of ex-
ceptions as a reason for his action, although he did
not state the facts in open court at the time of his
ruling, that one of the prisoners had been twice before
the court on charges of murder, on one of which he
was convicted; that he had escaped from jail, and was
a fugitive from justice when captured; that on another
occasion he had escaped from his guard although re-
captured; that both prisoners while in jail on this
charge had been furnished with arms of a dangerous

character by unknown persons, and with keys to unlock their handcuffs; that while in jail at Nashville they had found means or implements with which to make their escape, and had succeeded in getting out of their cell. The facts, his Honor said, seemed to indicate that the prisoners had confederates ready in any contingency to assist them. They were desperate men, and if unmanacled, the court was of opinion from observation that the accused could easily disarm the guard nearest them, and with their arms overpower other guards, and in the confusion make their escape, if they had confederates [near, willing to assist them. For these reasons, the court declined to control the discretion of the sheriff.

The result of the authorities upon the point raised by the motion of the prisoners, has been clearly expressed by this court in a recent case. "A prisoner," it was there said by the Chief Justice, "should not during his trial be manacled or handcuffed, but should be left free from shackles, unless some such restraint should be necessary to prevent escape": *Matthews* v. *The State*, 9 Lea, 128. Or, as it has been otherwise expressed by the Supreme Court of another State: "A prisoner undergoing trial should be free from shackles; but if the court or sheriff deem them necessary to prevent escape, the prisoner may be kept in irons during the trial, and this will not be ground for reversal." In other words, it is left to the sound discretion of the trial court whether the prisoner should be kept in shackles or not. And the appellate court will not revise its action except in a clear case of the abuse of

that discretion.　What would show an abuse of dis-
cretion may admit of doubt: *State* v. *Harrington,* 42
Cal., 165; *State* v. *King,* 64 Mo., 592. , But the record.
before us clearly shows no such abuse.

The prisoners were indicted . for killing K. E..
Baker on the night of February 8, 1881, at a coun-
try store.　Baker and one Ball were passing the store
about 12 o'clock at night, and noticing a light through
a crevice as they approached the store, called out for
the owner when in front of the building.　Two men
made a . hasty exit from the rear window of the store,
came around the corner, and commenced firing at Baker
and Ball.　These latter named persons turned their
horses heads, and started off, but Baker was killed,..
receiving two shots through the body, the balls enter-
ing the back, and coming out in front.　The proof
leaves no doubt that the persons who fired the fatal
shots were engaged in robbing goods from the store
at the time, some of which they carried off with them.
There is proof tending to show that a portion of
these goods were found in the possession of the pris-
oners when arrested about five days thereafter, and that
the prisoners then . gave themselves false names.　A
murder committed in the perpetration of any robbery,
burglary, or larceny is murder in the first degree by
the Code, sec. 4598.　The trial judge charged the
jury: "If it appears that a murder has been com-
mitted, and at the time and place a theft or robbery
is shown· to have been committed, the finding soon
thereafter of the stolen articles in the possession of the
party, if unexplained, is a strong circumstance tending

to show such to be the guilty party, and should be given such weight as you may think it entitled to in connection with the other evidence in the case; and if it be in the power of the accused to explain their possession and they do not do so, this intensifies and makes the evidence .of their guilty possession stronger. So would be the fact of the party denying his true name, or giving a false account of his whereabouts, or the place from which he came. These, and circumstances of like character, when found against parties are circumstances against their innocence to be considered by you.. If, however, these circumstances are explained, or shown to have been occasioned by other causes, the circumstances would lose their force or importance." This clause of the charge is assigned as error, in that part of it which speaks of the finding of. the stolen articles as a "strong circumstance," and that the failure to explain the possession, if in the power of the prisoners, "intensifies and makes the evidence of their guilty possession stronger."

The argument is that this part of the charge violates the Constitution, Art. 6, sec. 9: "Judges shall not charge jurors with respect to matters of fact, but may state the testimony and declare the law," His Honor, the trial judge, had already fully charged the jury as to what it takes to constitute murder in the first degree. He then instructs them in relation to the facts which would enable them to find the prisoners guilty of robbery. or larceny in the event they should reach the conclusion that a murder had been committed in the perpetration of a robbery or larceny. In this view,

he says to the jury if a theft or robbery.is shown to have been committed, the finding soon thereafter of the stolen articles in the possession of a person is, if unexplained, a strong circumstance to show such person to be the guilty party. But this is precisely the language of the learned judge who delivered the opinion of the court in *Wilcox* v. *The State,* 3 Heis., 118. While holding that the recent possession of stolen property cannot correctly be said to afford plenary proof of the guilt of the prisoner, although unexplained, yet he says: "It creates a strong presumption of guilt." And the absence of explanation, if in the power of the party, must necessarily make evidence of guilty possession stronger. In fact, the recent possession of stolen articles under these circumstances, would not merely be a strong circumstance, but raise a presumption of guilt, upon which the jury should convict. The language falls far short of the charge approved by this court in *Hughes* v. *The State,* 8 Hum., 75. The subsequent language of the judge leaves the jury the weighing of the facts under all the circumstances.

The person, who was with Baker when killed, proves that as they rode by the store he saw hitched to the rear of the building a blaze-faced sorrel horse, and a mouse-colored mule. John Poe, the eldest of the two prisoners, lived at his mother's house. The State introduced a witness who proved that he lived about half a mile from the residence of the mother of John Poe; that he owned at the time of the killing a blazed-face sorrel horse, gentle and easily caught, and

.running out in a lot on the night of the killing.
He rode the animal the second day after that night,
and found that it did not travel as freely as usual,
held its head down, and seemed stiff and jaded. He
also found that a neighbor, living about the same dis-
tance from the residence of Poe's mother, owned at
that time a mouse-colored mule. This testimony was
objected to by the defendants at the time, and the
objection is again urged in this court. But the tes-
timony was undoubtedly competent as tending to show
that animals such as those seen on the night of the
murder were in the neighborhood of the accused, and
accessible to him. Standing alone, the evidence might
not be of much weight, but it was competent for what
it was worth. The same may be said of the exhibi-
tion to the jury of the weapons and other articles
found on the persons of the prisoners when arrested.

The learned counsel of the prisoners insists that
the evidence is not sufficient to sustain the verdict.
It is entirely circumstantial. John Poe, the record
shows, had gone to Texas to avoid a criminal charge
pending against him, but had returned to his mother's
house a few months before the killing of Baker.
Cicero Poe had lived with his parents in Texas, but
was on a visit to his grandfather, at whose house he
was staying. The family consisted of the grandfather,
his daughter and a colored servant. On the evening
of the killing, two of the State's witnesses met Cicero
Poe about sundown on the public road, going in the
direction of the country store, about three miles from
the store. He was dressed in dark colored clothing

and wore a dark hat. One of the witnesses says he,· Poe, usually wore light colored clothes and a white hat, and the witness had never seen him wear a black hat before, or the suit of clothes he then had on. He saw him the next day about 9 o'clock in the morning at a village in the neighborhood, and he had on his white hat and light colored clothing. At the time the prisoner met the witnesses on the evening of the killing, he made a remark to the witnesses, from which they inferred that he was on his way to visit some loose women living in the direction he was going. The family, of which these women were members, has since the first trial of the prisoners moved away, but when or where does not appear except by rumor, which locates them in one of the neighboring counties, or in the State of Alabama. Neither on this trial, nor on the other trial so far as appears, was any proof offered by Cicero Poe to show where he was on the night of the killing. Both of the witnesses who thus met Cicero Poe say that they noticed a bulky projection of his left hand coat pocket in front, as it were the print of a pistol.

Suspicion did not at first point to the Poes as implicated in the murder of Baker. A negro, the owner of a blazed-face. horse, was taken up, but released upon a hearing before a magistrate. On the night after the murder, John Poe went to the house of a friend after dark, said he was tired and sleepy, seemed sleepy, and went to bed early. He said that he did not care about many people knowing where he was, explaining as the reason that the old prosecution,

on account of which he had left the State several years before, was about to be revived against him. And it seems that there was a rumor to that effect. On Thursday morning after the killing, John and Cicero Poe were seen by two witnesses on the land of John Poe's mother, going towards the mother's house with a pair of saddle-bags and a gun. They told the witnesses not to tell anybody that they had seen them. Five days after the killing, John and Cicero Poe are found at the Swiss colony in Grundy county, where they give themselves false names, and say they are from Boyle county in the State of Kentucky. They are arrested, and several articles of new clothing, and two knives of a particular pattern are found in their possession, which are identified as part of the stock in the country store on the night of the robbery. They also had in their possession a Winchester rifle and two large pistols.

When Baker was killed, his companion fled down the road in one direction, while the persons who did the killing went in the other direction, which was the opposite course from the road to the home of the Poes. These persons seem to have pursued this course along the public road, passing several cross-roads or paths which might have been taken for the purpose of reaching the house of the Poes in a roundabout way, until they reached what seems to have been the last cross-road which could be used for this purpose. Up to this point, various articles taken from the store were picked up at different places along the public road, dropped either by accident or design by the fu-

gitives in their flight.    There is the evidence of one
witness tending to show that the fugitives took this
last turn, the witness testifying that he was aroused
in the night by the clatter of horses feet, as if two
persons were riding rapidly along the road.

The prisoners offer no proof to explain the pos-
session of any of the articles above mentioned.    No
proof is introduced by Cicero Poe to show where he
was on the night of the killing.    John Poe does at-
tempt to establish the fact that he spent the night
at his mother's house.    But the evidence is so unsat-
isfactory, and is met by so many impeaching circum-
stances, that the jury were well warranted in discred-
iting it.

The evidence embodied in the bill of exceptions is
sufficient to sustain the verdict.

The jury found both defendants guilty of murder
in the first degree, with mitigating circumstances.    The
punishment of murder in the first degree is death by
hanging, but the court may commute the punishment
to imprisonment for life in the penitentiary when the
jury state in their verdict that there are mitigating
circumstances:    Code, secs. 4601, 5257.    The opinion
of the jury in regard to mitigating circumstances is
not binding on the court:  Lewis v. State, 3 Head, 127.
But it is entitled to grave consideration.    In this case,
the finding is supplemented by the affidavit of seven
of the jurors that they would not have agreed to the
verdict if they had not understood from the instruc-
tions of the court, and the advice of a fellow-juror
who professed to have experience in such cases and

knowledge on the subject, that the finding of mitigating circumstances by the jury would compel the court to commute the sentence to imprisonment.   Of course, the jury cannot be heard to say that they misunderstood the charge otherwise plain.   But we think the opinion of the jury thus strongly expressed entitled to weight in a case where the guilt of the prisoners is only made out by circumstantial evidence.   The sentence of both prisoners should be commuted to imprisonment for life.   And with this modification, the judgment will be affirmed.