CLIFTON, Circuit Judge,
dissenting:
I agree with my colleagues that we may properly reach the merits of this case. I also agree that the record seems somewhat thin regarding the benefits and detriments of the policy adopted in the Central District of California of requiring in-custody defendants to wear leg restraints or shackles during the initial court appearance before a magistrate judge. My view of the law would require a much stronger showing to set aside the policy than has been made by the defendants here, however. The justification for the policy — to improve court security — is evident, while there is essentially nothing in the record that demonstrates any actual negative impacts from the practice when there is no jury present to be influenced, as there is not during the initial court appearance. At a time when concern for court security is understandably and properly high, I would accept the judgment of the district court — and the collective judgments of the judicial officers most affected, the magistrate judges of the Central District — and affirm.
As an initial matter, I disagree with the majority opinion regarding the legal basis on which it rests its reversal of the district court. The majority opinion refers to the substantive due process rights of pretrial *853 detainees against restrictions that amount to punishment, but that is premised on an inference that the leg-restraint policy is “punishment” because it is “ ‘not reasonably related to a legitimate goal — ■... it is arbitrary or purposeless — [such that] a court permissibly may infer that the purpose of the governmental action is punishment.’ ” Ante at 851 (quoting Bell v. Wolfish, 441 U.S. 520, 539, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).
There is not the slightest suggestion in the record here that the leg-restraint policy was intended to be punitive. The district court found that the policy was adopted “[b]ecause of security concerns,” and that finding was not clearly erroneous.
That being the case, Bell instructs us differently as to the law. The portion quoted by the majority opinion was preceded by the following statement: “[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to ‘punishment.’ ” Id. That sentence was accompanied by a footnote, which stated, in part: “[I]n the absence of a showing of intent to punish, a court must look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate non-punitive governmental objective.” Id. at 539, 99 S.Ct. 1861 n. 20. And the sentence quoted by the majority, regarding purposeless restrictions which may be inferred to amount to punishment, is followed by another footnote: “ ‘There is, of course, a de minimis level of imposition with which the Constitution is not concerned.’ ” Id. at 539, 99 S.Ct. 1861 n. 21 (quoting Ingraham v. Wright, 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)).
In the absence of any evidence of an intent to punish, or any evidence that a defendant required to wear leg restraints during the initial public hearing suffers any actual harm (or more than de minimis harm), there can be no due process violation. The holding of Bell was that certain conditions of confinement complained of by pretrial detainees at the Metropolitan Correction Center in New York City did not violate the Due Process Clause. The Court reversed a decision by the Second Circuit that “pretrial detainees may be subjected to only those ‘restrictions and privations’ which ‘inhere in their confinement itself or which are justified by compelling necessities of jail administration.’ ” Wolfish v. Levi, 573 F.2d 118, 124 (2d Cir.1978) (quoting Rhem v. Malcolm, 507 F.2d 333, 336 (2d Cir.1974)).
The approach taken by the majority opinion echoes the erroneous approach of the Second Circuit, which the Court reversed in Bell, by putting the burden on the district court and the U.S. Marshals Service to justify the necessity for the leg-restraint policy. Bell put the burden, which it described as “heavy,” on the defendants objecting to the restrictions: “Respondents simply have not met their heavy burden of showing that these officials have exaggerated their response to the genuine security considerations that actuated these restrictions and practices.” Id. at 561-62, 99 S.Ct. 1861. The defendants have not nearly met that “heavy burden” here, either.[1]
*854 The Central District of California is the largest federal judicial district in the country. The district is authorized to have twenty-two full-time magistrate judges, plus one parttime position. As indicated by the district court’s order, the policy in question was.discussed by the magistrate judges of the district in April 2003. They decided to approve the policy and to apply it uniformly to the initial appearances of all in-custody defendants in the district.
The district court affirmed the policy, announcing its findings in the form of the statement of facts section in its order filed October 8, 2003:
The initial appearances of in-custody defendants take place in a large courtroom on the third floor of the Roybal Courthouse. The number of in-custody defendants present in the courtroom can vary greatly depending upon the number of arrests made. At the initial appearance, magistrate judges read defendants their rights, confirm that defendants have received a copy of the complaint or indictment stating the charges against them, appoint counsel to represent the indigent defendants, and set dates for the defendants’ preliminary hearings and post-indictment arraignment.
The magistrates also make a preliminary determination of bond and detention issues. In some cases, a full eviden-tiary detention hearing will occur at the Sinitial arraignment. Lay witnesses or law enforcement officers may testify at these hearings. Friends and family members of defendants often are present to act as potential sureties and to give defendants support. Their presence, while appropriate, adds to potential security concerns.
Because of security concerns, the United States Marshal Service (“USMS”) adopted certain policies after consultations with the magistrate judges. As part of USMS policy, defendants are fully restrained while being transported to the courtroom. For their initial appearances, the waist chains and handcuffs are removed, but the leg restraints (“shackles”) are not removed. United States Marshals are trained in properly applying restraints so that the restraints do not cause pain.
Shackling is designed to ensure that courtrooms are safe and orderly.[2] Even while restrained defendants have assaulted members of the USMS, as well as other members of the government.[3] According to the acting United States Marshal, the need for restraints is particularly acute given the current staffing shortages at the USMS. The USMS currently has just 59% of its allocated staffing for this district.
The USMS believes that it “is not possible to conduct an individualized analysis of a defendant at the time of the initial appearance,” in part, because “it is not possible to obtain a criminal history,” Moreover, the magistrates appear to *855 agree that a uniform shackling policy should apply at initial appearances.....
(Citations omitted).
The general motivation for the policy is plain. As the district court found, the Marshals Service adopted the policy “[because of security concerns.” The policy is intended “to ensure that courtrooms are safe and orderly.” That is confirmed by the April 10, 2003 memorandum in which the Marshals Service described the policy. It made clear that it was based upon the authority of the Service to “provide courtroom security for the Federal Judiciary [and] protection of Federal Jurists and other court officers.” The document expressly noted that “there is no greater responsibility tasked to the U.S. Marshals Service than that of ensuring the protection of the Judicial Process, which includes the personal protection of all entities (Jurists, jurors, U.S. Attorneys, defense counsel, and others) as well as the safeguarding and security of federal prisoners.”
The subject of court security has received substantially greater attention since then because of two tragic episodes earlier this year. One was the murder of the husband and mother of a federal district judge in Chicago, Illinois on February 28, 2005, by a disgruntled civil litigant. The other was the murder by a criminal defendant of a state court judge and a court reporter inside the Fulton County, Georgia courthouse, as well as a deputy sheriff outside the courthouse, on March 11, 2005. Neither of these incidents arose in the context of an initial appearance by a criminal defendant before a federal magistrate judge, of course, but they underscore the inherent danger that lurks in a courthouse. Many of the people there are prone to violence and are under enormous stress.
The Judicial Conference of the United States responded to these events by adopting a resolution at its meeting in March 2005 which asked the Justice Department and the Marshals Service “to review fully and expeditiously all aspects of judicial security.” (Emphasis added.) The following month, the chair of the Judicial Conference Committee on Security and Facilities, Judge Jane Roth of the Third Circuit, told a House subcommittee, as reported by the official newsletter of the federal courts, that the Marshals Service judicial security program is “chronically understaffed and underfunded.” U.S. Marshals Service Resources Faulted by Federal Judiciary, The Third Branch, May 2005, at 1. The staffing shortages described eighteen months before by the district court in this case are a reflection of this chronic problem.
I simply cannot conclude, as does the majority opinion, that the record gives no justification for the policy or fails to describe circumstances which support the application of a district-wide policy. Ante at 851. The district court concluded that it was not possible to obtain criminal histories of all in-custody defendants prior to their initial appearances, let alone to do an analysis of the threat posed by each individual. Perhaps only a few of defendants pose a serious threat, but if it cannot be determined by the time of the initial appearance which defendants those are, it is logical to be cautious with all of them. An ounce of prevention is, after all, worth a pound of cure. These defendants are fully restrained — with handcuffs and waist chains in addition to the leg restraints— before and after their courtroom appearances, and no objection to that treatment has been made here. The advantage of maintaining some of that control in the courtroom, by leaving the leg restraints on when the handcuffs and waist chains are removed, is clear. That is particularly true when the Marshals Service is understaffed, as we know that it is. If we cannot be sure that there will be sufficient *856 deputy marshals or other security officers present in the courtroom to control all unrestrained defendants, then it makes sense to leave the leg restraints on, unless there is a reason not to.
There is, of course, a very good reason not to when doing so might prejudice the defendant. As the majority opinion notes, nearly all of the caselaw on this subject has involved a proceeding in front of a jury. Ante at 850. The use of shackles or restraints in a context where they might be observed by a jury could have a negative and prejudicial effect. The law on that subject is well-established, as most recently discussed by the Supreme Court in Deck v. Missouri, — U.S. -, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005). In that case the Court held that the use of visible shackles during the penalty phase of a capital murder trial is forbidden, just as it forbidden during the guilt phase, unless that use is “justified by an essential state interest — such as the interest in courtroom security — specific to the defendant on trial.” Id. at 2009 (internal quotation marks omitted). But in the current case, fear of such prejudice is not at issue, as the majority opinion acknowledges, ante at 850, because there is no reason to presume that the magistrate judge will be prejudiced by seeing the defendant in leg restraints.
Reasons not to permit the regular use of leg restraints in the context of the initial appearance before the magistrate judge are much harder to pin down. Indeed, if the record in this case fails to provide support for some proposition, it is the proposition that any actual harm has resulted from the use of leg restraints. On that score, the record is completely blank.
The negative effects identified by the majority opinion appear to fall into two categories. One is that the use of restraints would constitute “ ‘an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.’ ” Ante at 851 (quoting Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)). But the Court in Allen was discussing a defendant completely restrained, “bound and gagged,” id., during his trial before a jury, not a defendant wearing leg restraints while making an initial appearance in a courtroom filled with other defendants awaiting their initial appearances. Anyone who has been present in a courtroom filled with such defendants, particularly in a busy urban court, understands that “decorum” is a relative thing. More to the point, what effect the leg-restraint policy has on the decorum of the court and what negative impact that has on the defendant may be impossible to define precisely, but I have to believe that the answers are “not much” and “none.” The alternative identified by the district court as that used in Los An-geles Superior Court — the use of cages— certainly seems much worse. There is nothing in this record that establishes any negative impact on the dignity of the court. Since the policy at issue was specifically approved by the judicial officers most affected and in the best position to evaluate the impact on the court, namely the magistrate judges of the Central District, I conclude that this factor adds little if any weight to the negative side of the scale.
The second category focuses more directly on the negative impact on the defendants. Thus, the majority opinion notes that the Court in Allen “expressed concern that restraints could greatly reduce the defendant’s ability to communicate with counsel.” Ante at 851. That is true, but in Allen the Court was talking about a defendant who was “gagged,” not one simply wearing leg restraints. It is not apparent how leg restraints, without a gag, would prevent a defendant from talking *857 with his attorney. There is nothing in the record from any of the eighteen defendants challenging the policy, any of their attorneys, any other defense attorney, or anyone else that explains or illustrates how the use of leg restraints prevents communication, let alone attesting to any actual prejudice or negative impact from the policy at issue.
Similarly, the majority opinion refers to observations in other court decisions to the effect that “shackling may confuse and embarrass the defendant, thereby impairing his mental faculties.” Ante at 851. In the context of the initial appearances at issue in this case, that appears to be pure speculation. We are dealing with defendants who have been held in custody, then transported to the courtroom wearing handcuffs, waist chains, and leg restraints. At the courtroom, the handcuffs and waist chains are removed. That the leg restraints are not removed as well is unlikely to have such a dramatic effect on the defendant. Again, there is nothing in the record that supports the conclusion that it does.
Finally, the majority opinion states that there may be “physical and emotional pain” suffered by the defendant. Ante at 851. But no defendant has attested to any such pain. There is nothing in the record supporting that conclusion. Why pain would be uniquely felt from wearing leg restraints in the courtroom by a defendant who wore the same leg restraints and also handcuffs and a waist chain before and after the courtroom appearance, while being transported to and from the courtroom, is not evident. The district court here found that the marshals are trained in properly applying restraints so that the restraints do not cause pain. That finding was not clearly erroneous.
Thus, I disagree with the conclusion in the majority opinion that there is “no basis on which we can assume the benefits of the policy outweigh the costs and the disadvantages.” Ante at 852. In my view, what the record fails to support is the notion that there are actual costs and disadvantages. The potential benefit of restraining defendants is plain.
What is unknown here is the probability that some unfortunate incident will occur without the leg restraints. On that subject I agree with the majority that the record does not demonstrate a substantial risk. But we should not limit the court’s ability to take precautions to situations of demonstrated or substantial risk. In over thirty-five years of driving, I have never been in a serious automobile accident, and the percentage chance of that happening the next time I climb into my car is, I assume, incredibly small, but that does not mean that I should not buckle my seat belt and make sure that everyone else is buckled up, too. Effective security necessarily means protecting against the highly unlikely and against something that may not previously have occurred. The court should not have to suffer a tragedy before taking precautions.
The decision whether or not to adopt this policy involved a balancing of the perceived benefits, which includes a consideration of the amount of risk, and of the detriments. Because I see very little on the negative side of the scale, at least on the current record, I would not disagree with the decision of the Central District that the benefits of the policy outweigh the detriments. More importantly, under the proper legal standard, I do not believe defendants have demonstrated a violation of the Due Process Clause.
Like the majority, I agree that our decision today should not be the last word, and I would say that even if my view prevailed and we affirmed. This policy should be subject to further consideration and re *858 view, and if a challenge to the policy demonstrated a negative impact the court should take that into account. On the current record, though, that impact has not been shown.
Justice Breyer’s opinion for the Court in Deck noted that the rule that a criminal defendant may be shackled during a criminal trial only when there is a special need had “deep roots in the common law.” 125 S.Ct. at 2010. It also noted, however, that “Blaekstone and other English authorities recognized that the rule did not apply at ‘the time of arraignment,’ or like proceedings before the judge.” Id. (citations omitted). Blaekstone was right. That rule should not apply here.
I respectfully dissent.

. That is why, in part, the observation in the majority opinion that "financial concerns should not be a justification for cutting back on the constitutional rights of criminal defendants" misses the point. Ante at 852. There is no constitutional right for a defendant in custody to be free of leg restraints. Nor does the Due Process Clause require the government to hold pretrial detainees or defendants in the courtroom in the manner that is least restrictive for the defendant, no matter what the expense. In making this decision about *854 court security, there is nothing inappropriate about the court and the Marshals Service taking into account the resources available.

. Rather than shackles, Los Angeles Superior Court uses cages in which defendants must remain during their initial appearance. (Footnote in original) (citation omitted).

. In the courtroom of the Honorable William Rea on June 5, 2003, an unshackled prisoner verbally attacked the Assistant United States Attorneys and FBI case agent after the prisoner was convicted. "When the deputies began to handcuff the defendant he resisted and pulled away. The deputies were required to take the defendant to the floor in order to handcuff him and take him into custody.” (Footnote in original) (citations omitted).