IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 7, 2006

## STATE OF TENNESSEE v. LARRY PAYNE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-01217    Joseph B. Dailey, Judge**

---

**No. W2005-00679-CCA-R3-CD  - Filed June 1, 2006**

---

A Shelby County Criminal Court jury convicted the appellant of four counts of aggravated robbery against two victims, and the appellant received an effective thirty-six-year sentence.  In this appeal, the appellant claims (1) that the evidence is insufficient to support the convictions; (2) that the trial court erred by requiring Detention Response Team personnel to sit next to him in the courtroom and while he testified; and (3) that his sentences are excessive.  After a thorough review of the record, we conclude that the four convictions should be merged into two convictions and that the case should be remanded for entry of corrected judgments consistent with this opinion.  In all other respects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed as Modified and Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Garland Erguden and Robert Wilson Jones (on appeal) and Jennifer Johnson and Trent Hall (at trial), Memphis, Tennessee, for the appellant, Larry Payne.

Paul G. Summers, Attorney General and Reporter; Leslie Price, Assistant Attorney General; William L. Gibbons, District Attorney General; and Greg Gilbert, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

On the night of October 24, 2003, Emma Brown was working at M & T Bakery in Memphis. At trial, Brown testified that business was slow and that she and several friends were playing cards in the bakery's back room.  The bakery was open twenty-four hours per day, but the doors were locked at night.  About midnight, a man named David came to the front door and rang the doorbell.

Brown knew David's aunt, Deborah Griffin, and had seen David in the store about one week earlier. Brown went to the front door and opened it. As David came into the bakery, a man with a gun came from around the side of the building. Brown tried to close the door, but David pushed her aside, and the gunman came into the store. Brown stated that the gunman was wearing a bandana across the bottom of his face but that she could see his face "from eyes up." She said that the gunman's "head was kind of large," that he had a low-cut Afro hairstyle, and that she had never seen him before.

Brown testified that the gunman put the gun to her head, demanded money, and pulled her hair. David took Brown's purse off a table and got money out of it, and the gunman got money out of Brown's coat pocket. The gunman asked who owned the Dodge Durango parked outside and demanded the keys or he "was going to kill this bitch." Marvin Qualls, who had been playing cards with Brown, gave the gunman the keys. The gunman also demanded Qualls' wallet. A third man ran into the store briefly but ran out, and the gunman and David ran out of the store. Brown stated that the robbery lasted ten to fifteen minutes and that she waited a few minutes before telephoning the police.

Brown testified that she gave a statement to Sergeant Joshua Clay of the Memphis Police Department. On November 1, 2003, Sergeant Clay showed Brown a photographic array, and Brown picked out David Hicks' photograph. She picked out the appellant's photograph from a second array and identified him as the masked gunman. Brown said that she picked out the appellant's photograph "[b]ecause of the way his forehead was made on the pictures, I could recognize – that's what I was going by." She said she also identified the appellant from a lineup at the preliminary hearing in general sessions court. At the conclusion of her direct testimony, Brown identified the appellant in court as the gunman.

On cross-examination, Brown testified that she gave the police a description of the gunman and that the gunman was about five feet, six inches tall; weighed about one hundred thirty-five pounds; and had a medium build. She said she did not remember telling Sergeant Clay that she could not recognize the gunman because he was wearing a bandana. She acknowledged that when the gunman first came into the store, she was only able to look at him for five to ten seconds. She said that no surveillance cameras were in the bakery but that she was certain the appellant was the gunman.

Marvin Qualls testified that on the night of the robbery, he and some other people were playing cards at the bakery. A man named David rang the doorbell, and Emma Brown unlocked the door. Qualls had seen David in the store before. Brown opened the door, and a second man with a handgun "bum-rushed" her. The gunman was wearing a bandana across his face; had a medium build; was five feet, six inches to five feet, eight inches tall; weighed one hundred thirty-five to one hundred fifty pounds; and had a medium complexion. The gunman pointed the gun at Brown; grabbed her by the hair; and said, "Bitch, you know what I came for. Give me that money, Bitch, or else I'm going to blow your damn brains out." Brown was crying and screaming. The gunman called out Qualls' first name, but Qualls did not know the gunman. The gunman demanded the keys to the Durango parked outside, and Qualls gave them to him. The gunman also demanded Qualls'

money, and Qualls gave the gunman his wallet and the money he had in his pocket. Qualls said that Brown was lying on the floor, that the gunman was standing over her, and that he believed the gunman would have shot her if he had not given the gunman the keys to the Durango. The gunman said, "Anybody come through this door in the next five/ten minutes, you're going to get killed." David and the gunman left the bakery, and Qualls heard the Durango pull away.

Qualls testified that he gave a statement to Sergeant Clay and looked at a photographic array. He picked out David Hicks' photograph, but could not identify the gunman. Qualls recognized the appellant as the gunman during the preliminary hearing in general sessions court. He said that the appellant was sitting with some other inmates at the hearing and that "[h]is eyes and his, you know, was kind of puffy around here, and the picture [in the array] didn't show that." He said that the appellant's "fat eyebrows" were a distinguishable feature. At the conclusion of his direct testimony, Qualls identified the appellant in court as the gunman.

On cross-examination, Qualls testified that when David Hicks rang the doorbell, Qualls walked to the front of the store with Brown. After the gunman ran into the store, Qualls ran into the back room, and the appellant dragged Brown by her hair into the room. The appellant did not tell him to lie down. However, Qualls acknowledged giving a statement to police on October 27, 2003, in which he said the gunman told everyone to lie on the floor. He denied telling police that he did not see the gunman's face but acknowledged that he was unable to identify the gunman from the photographic array. He said that he was not in the courtroom during Emma Brown's testimony at the preliminary hearing and that he did not see Brown identify the appellant at the hearing. He estimated that the robbery lasted three to five minutes and acknowledged that he and Brown discussed the facts of the case.

Sergeant Joshua Clay of the Memphis Police Department's robbery bureau testified that he investigated the robberies. Emma Brown told Sergeant Clay that she let David into the store and gave Sergeant Clay the name of David's aunt, Deborah Griffin. Sergeant Clay talked with Griffin, and Griffin gave Sergeant Clay the names of David Hicks and Hicks' two half-brothers, the appellant and D'Andre Scott, who "might have put [Hicks] up to this." Griffin also told Sergeant Clay that the appellant and Scott lived at the Watkins Manor apartment complex.

Sergeant Clay testified that as a result of an anonymous telephone call, he learned that Qualls' Durango was at 864 North Second Street and that the "people who were responsible" were sitting in the Durango and playing loud music. Sergeant Clay and his partner went to the scene and saw the Durango, which was about to back out of the parking lot. The appellant was driving the vehicle, and sixteen-year-old Michael Collins was his passenger. A patrol car stopped the Durango, and the appellant told Sergeant Clay that he had just picked up Collins and Collins' family from church. Sergeant Clay later learned that the appellant had taken the Collins family to church and that Collins was not involved in the robberies. The appellant told Sergeant Clay that he found the Durango with the doors open and the key in the ignition at the Watkins Manor apartment complex and that he took the vehicle joyriding. Sergeant Clay said that Emma Brown came to the police

department and selected the appellant's photograph from a photographic array. Marvin Qualls also looked at a photographic array but only selected David Hicks' photograph.

The then twenty-four-year-old appellant testified that Emma Brown knew some of his relatives and used to buy crack cocaine from him. About two weeks before the robberies, the appellant and Hicks sold cocaine to Brown. During the sale, Brown told the appellant that her boss, who owned the bakery, was "messing around with her money" and that she wanted to set up a robbery. The appellant told Brown that "I don't do things like that just for free" and that he had to have the money in advance. Brown told the appellant that she did not have the money to pay him, and the appellant refused to commit the robbery. On October 24, 2003, the appellant went to Deborah Griffin's house. David Hicks was there but left with some men. About 11:30 p.m., Hicks and a man named Nick returned with the Durango. Nick had previously bought cocaine from the appellant, and the appellant thought Nick owned the Durango. The next day, the appellant used the Durango to take the Collins family to church. After a police car stopped the appellant, the appellant denied knowing anything about the robberies. He said that at the time of the stop, he was returning the Durango to Nick. He acknowledged having prior convictions for aggravated burglary and felony theft.

On cross-examination, the appellant acknowledged that he was a crack cocaine dealer and that he had been selling crack since he was twelve or thirteen years old. He said that Nick swapped the Durango for crack but that he was planning to return the Durango to Nick. The appellant denied telling a police officer that a man named Isaac robbed the bakery with David Hicks and D'Andre Scott. He said that he never gave a statement to Sergeant Clay and that he never told Clay he found the Durango. He said that when he saw the police car following him, he figured out that the Durango was stolen. He said that he had never been to the bakery before and that he did not know if Hicks and Nick participated in the robberies. When asked if he knew who committed the robberies, the appellant said, "I just heard rumors." The jury convicted the appellant of two counts of aggravated robbery, a Class B felony, against Emma Brown and two counts of aggravated robbery against Marvin Qualls.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support the convictions because no proof other than the eyewitnesses' identifications place him at the scene of the crimes. He notes that no co-defendants testified against him, that no fingerprints were found on the bakery doors, and that none of the stolen property was recovered from him. He contends that his convictions rest solely on Brown's and Qualls' identifications and that a note sent by the jury to the trial court during deliberations "reflects the essential lack of confidence which can be placed in the victims' identifications." While the appellant concedes that he was found with Qualls' stolen vehicle after the robberies, he argues that "drug 'pawns' for vehicles are a common occurrence." The State claims that the evidence is sufficient. We agree with the State.

-4-

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As charged in the indictments, aggravated robbery is defined as robbery "[a]ccomplished with a deadly weapon." Tenn. Code Ann. § 39-13-402(a)(1). Robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401.

In the instant case, Emma Brown testified that she opened the bakery door for David, that David pushed her, and that a gunman ran into the store. The man put a gun to Brown's head, took money from her and Marvin Qualls, and left in Qualls' Dodge Durango. Shortly after the robberies, Brown picked the appellant's photograph from a photographic array. She also identified the appellant at the preliminary hearing and at trial. Although Marvin Qualls did not select the appellant's photograph from a photographic array, he identified the appellant at the preliminary hearing and at trial. The day after the robberies, Sergeant Clay found the appellant driving the stolen Durango. The appellant admitted driving the Durango but claimed that he and a man named Nick swapped the vehicle for drugs. We conclude that the appellant's being found in possession of the Durango, coupled with the witnesses' identifications of him as the gunman, provide sufficient proof of his guilt.

As the appellant points out in his brief, the jury sent a note to the trial court during jury deliberations that stated, "[H]ung on witness' ID of armed robber - is there a lesser charge - maybe receiving stolen goods - possession of stolen property?" The trial court responded that the jury had received all the proof in the case and that it should resume deliberations. As it had in the original charge, the trial court also stated, in pertinent part,

> If, upon all the proof, you have a reasonable doubt of the defendant's guilt of the offenses charge[d] and included under the law defined and explained to you, it is your duty to acquit him, and your verdict would be, "We, the jury, find the defendant not guilty . . . ."

Obviously, the jury resolved its question regarding the gunman's identity in favor of the State. The jury, as was its prerogative, chose to accredit the victims' identifications of the appellant as one of the robbers. We conclude that the evidence is sufficient to support the convictions.

We note, however, that the appellant's dual convictions for each victim cannot stand. Count one of the indictment alleges, in pertinent part, that the appellant

> did unlawfully, knowingly, and violently, by use of a deadly weapon, to wit: handguns, obtain from the person of EMMA BROWN: a sum of money[,] proper goods and chattels of EMMA BROWN, in violation of T.C.A. 39-13-402, against the peace and dignity of the State of Tennessee.

Count two alleges that the appellant

> did unlawfully and knowingly, by use of a deadly weapon, to wit: handguns, put EMMA BROWN in fear and obtain from the person of EMMA BROWN: a sum of money[,] proper goods and chattels of EMMA BROWN, in violation of T.C.A. 39-13-402, against the peace and dignity of the State of Tennessee.

Counts three and four charge the appellant with the aggravated robberies of Marvin Qualls. Other than the victims' names, the wording in count three is identical to that in count one, and the wording in court four is identical to that in count two. However, counts one and two allege the same offense, i.e., the aggravated robbery of Emma Brown, and counts three and four allege the same offense, i.e., the aggravated robbery of Marvin Qualls. Accordingly, the convictions for counts one and two must be merged, and the convictions for counts three and four must be merged.

### B. Detention Response Team

Next, the appellant claims that the trial court erred by requiring uniformed Detention Response Team (DRT) personnel to sit on either side of him in the courtroom and to stand next to him during his testimony. He contends that their presence prejudiced the jury against him. The State claims that the appellant waived this issue for failing to object at trial and that, in any event, there is no evidence of prejudice. We conclude that the appellant is not entitled to relief.

Before the State called its first witness, the appellant asked that the trial court appoint him a new attorney because "we, you know, have a conflict of interest." The appellant told the trial court that his attorney had been on his case for only one week, that he was not going to be allowed to present his alibi witness, that he knew more about his case than his attorney, and that "there's no understanding between us." The appellant asked for time to hire an attorney, but the trial court refused, noting that the case had been pending for over a year and that the appellant's counsel "is an outstanding attorney . . . fully prepared to go forward with this case." The following exchange then

-6-

occurred:

| | |
|---|---|
| [Appellant]: | I'm not going to go to trial with her. I'm not going to trial with her. |
| THE COURT: | You are going to trial with her, and I'll just say this: If you act up, you'll be taken out of the courtroom, and you won't be in court. |
| [Appellant]: | I don't care nothing about that, but I'm not going to trial with her. |
| . . . . | |
| [Appellant]: | You're going to f[***] me over. |
| THE COURT: | Okay. If you speak up or act up, you're going to be taken out of the courtroom. We're going to go forward with the trial this week. |
| . . . . | |
| [Appellant]: | Do what you got - I don't give a f[***] about what you gonna do. I'm not going to trial with her. She's been on this case for - come to see me a week before I'm set for trial and then tell me this old bullshit these folks trying to do to me, and now says she's trying to help me - ain't nothing she helped me with. Get f[***]ed off like that - crazy as hell. |

The appellant told the trial court to "[t]ake me downstairs, man," and the trial court told security to "assist Mr. Payne back to the lockup." The trial court talked briefly with the appellant's attorney about the appellant's alibi claim; asked that security bring the appellant to the doorway of the courtroom; and told the appellant, "Mr. Payne, we do try to operate in a civilized manner in this courtroom, and that's why you're going to sit back in lockup while we try this case." The trial court tried to explain the situation regarding the appellant's alibi witness, but the appellant said, "I don't want to hear this shit, man" and asked to be taken back downstairs.

The trial court stated that because of the appellant's "conduct and his language, he has forfeited the right to remain in the courtroom. I think he's a security threat. I think he's a threat to [his attorney] who has to sit right in front of him." The trial court determined that when the State's witnesses wanted to make an in-court identification of the masked robber during their testimony,

security could bring the appellant into the courtroom and then escort him out after the identifications. When the jury entered the courtroom, the trial court explained that the appellant had been removed from the courtroom due to his conduct and that the jury should not hold his absence against him. During Emma Brown's testimony, the State asked her if she would recognize the gunman if she saw him, and she said, "I probably would." The trial court asked that the appellant step into the courtroom, and a deputy approached the bench and said, "He's refusing to come in here. We can drag him in here, but I don't know. He may cause a ruckus." Without incident, the appellant came into the courtroom, and Brown identified him as the gunman. During Marvin Qualls' testimony, the State had security bring the appellant back into the courtroom, and Qualls' also identified him as the gunman.

After the defense cross-examined Qualls, the appellant sent word to his attorney that he would behave if allowed to return to the courtroom. The trial court allowed the appellant to return but stated,

> I do feel, given his conduct and his demeanor that he is a legitimate and serious threat to people around him if he's not closely guarded.
> For the record, just ironically, this very week there's a trial going on in Division X of these courts trying a man accused of murdering his attorney, Mr. Robert Freedman, a couple of years ago. And so these threats and this conduct - this type of conduct should be viewed seriously by all. And least if the appellate courts, if this matter ever goes up on appeal, feel that trial courts overreact and it's too burdensome or too incriminating to have DRT people sitting on either side of the defendant, I view these types of actions very seriously and view this man as a definite potential threat to anyone around him. So, we will bring him in, and I will have the DRT people sitting on either side of him.

Although not reflected in the record, the appellant's brief claims that uniformed DRT personnel also stood next to him during his testimony. He contends that although he was not "'shackled' with iron," the DRT personnel were the equivalent of shackles and "poisoned" his right to a fair trial.

Both the appellant's and the State's briefs cite Holbrook v. Flynn, 475 U.S. 560, 106 S. Ct. 1340 (1986), in which the United States Supreme Court held that a petitioner was not inherently prejudiced by the presence of four uniformed state troopers during his and his five co-defendants' two-month trial for armed robbery. In that case, the trial court had held that the officers' presence was necessary because courtroom security was overextended at the time. Id. at 563, 106 S. Ct at 1343. However, unlike the present case, the officers in Holbrook sat behind the defendants and were separated from them by the "bar." Id. at 562, 106 S. Ct. at 1342. The Supreme Court held that when a courtroom security arrangement is challenged as inherently prejudicial, the question becomes whether there is "an unacceptable risk . . . of impermissible factors coming into play." Id. at 570, 106 S. Ct. at 1346-47. The Court explained,

-8-

We do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial. But we simply cannot find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section. Even had the jurors been aware that the deployment of troopers was not common practice . . . , we cannot believe that the use of the . . . four troopers tended to brand respondent in their eyes "with an unmistakable mark of guilt." Four troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings. Indeed, any juror who for some other reason believed defendants particularly dangerous might well have wondered why there were only four armed troopers for the six defendants.

Id. at 571, 106 S. Ct. at 1347 (citations omitted).

The appellant and the State also cite Deck v. Missouri, 544 U.S. 622, 125 S. Ct. 2007 (2005), a case that involved a defendant's wearing shackles in the courtroom. The Supreme Court stated,

There will be cases, of course, where these perils of shackling are unavoidable. We do not underestimate the need to restrain dangerous defendants to prevent courtroom attacks, or the need to give trial courts latitude in making individualized security determinations. We are mindful of the tragedy that can result if judges are not able to protect themselves and their courtrooms. But given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case.

Id. at 632, 125 S. Ct. at 2014. Thus, the Court recognized that dangerous defendants may need to be restrained. However, "any such determination must be case specific; that is to say, it should reflect particular concerns, say special security needs or escape risks, related to the defendant on trial." Id. at 633, 125 S. Ct. at 2015. Moreover, "given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." Id. at 632, 125 S. Ct. at 2014. In State v. Robert Hood, No. W2004-01678-CCA-R3-DD, 2005 Tenn. Crim. App. LEXIS 1008, at *51 (Jackson, Sept. 13, 2005), another case involving the use of uniformed DRT personnel sitting on either side of the defendant during trial, a panel of this court concluded that "the holding in Deck v. Missouri is a reasonable rule that should be applied to any restraint imposed on a criminal defendant in the courtroom."

Turning to the instant case, we initially note that the appellant failed to object to the DRT's presence at trial and that the failure to make a contemporaneous objection waives the issue. See Tenn. R. App. P. 36(a). In any event, in light of the particular circumstances of this case, we cannot

conclude that the trial court abused its discretion by imposing these additional security measures in the courtroom. The appellant used obscene and inappropriate language with the trial court. The transcript conveys that the appellant was hostile and disruptive, interrupting the trial court several times. The trial court stated that in light of the appellant's conduct and demeanor, it was concerned for the defense attorney's safety, especially because she had to sit in front of the appellant during the trial. Although the appellant contends that the trial court's response to his actions was "ill judged," the trial court was in a better position than this court to observe the appellant's demeanor and attitude, and we will not second-guess its finding that the appellant posed a danger to his attorney. We note that during the appellant's cross-examination, the State asked him a question about Emma Brown's being dragged by her hair, and the appellant asked the State to repeat the question, saying that he was not paying attention. The State asked the appellant what he was thinking about, and he stated, "I'm thinking about my attorney right now," an ominous response. The appellant cites nothing in the record to indicate that the DRT personnel caused prejudice, and we conclude that he is not entitled to relief.

### C. Excessive Sentence

Finally, the appellant claims that his sentences are excessive. Specifically, he contends that the trial court erred by sentencing him to almost the maximum punishment within the applicable range and by ordering consecutive sentencing. The State claims that the trial court properly sentenced the appellant. We conclude that the appellant's sentences are not excessive.

No witnesses testified at the sentencing hearing. However, the trial court relied heavily on the appellant's presentence report. According to the report, the then twenty-four-year-old appellant was single, and both of his parents were incarcerated. The report shows that the appellant graduated from high school in 1998 and worked for the University Club of Memphis from January 1998 to December 2000. In the report, the appellant stated that he was in good mental and physical health and that he did not use illegal drugs or alcohol. The report shows that the appellant has one prior conviction for aggravated burglary and one prior conviction for theft of property valued over $1,000 but less than $10,000. He also has misdemeanor convictions for disorderly conduct and solicitation to commit aggravated burglary and was adjudicated delinquent in juvenile court for aggravated assault, ungovernable behavior, and truancy.

The trial court determined that given the appellant's two prior felony convictions, he was a Range II offender. See Tenn. Code Ann. § 40-35-106(a)(1), (c). The trial court also applied enhancement factor (1), that the appellant "has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range." See Tenn. Code Ann. § 40-35-114(1) (2005). The court enhanced the appellant's sentences by six years, imposing an eighteen-year sentence for each aggravated robbery conviction. Regarding consecutive sentencing, the trial court found the appellant to be a dangerous offender "without a doubt." The trial court ordered that the appellant serve the sentences for the robberies of Marvin Qualls concurrently to each other but consecutively to the sentences for the robberies of Emma Brown, for an effective sentence of thirty-six years in the Department of Correction.

Appellate review of the length, range, or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. § 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentences. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The appellant claims that the trial court erred by sentencing him to the near maximum punishment for a Range II offender convicted of a Class B felony. However, the appellant makes no argument as to why the trial court improperly enhanced his sentences and has waived the issue. See Tenn. Ct. Crim. App. R. 10(b) (providing that "[i]ssues which are not supported by argument . . . will be treated as waived in this court"). Turning to the issue of consecutive sentencing, Tennessee Code Annotated section 40-35-115(b)(4) provides that a trial court may impose consecutive sentences if the defendant is convicted of more than one offense and the trial court finds by a preponderance of the evidence that the defendant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our supreme court held that satisfying Tennessee Code Annotated section 40-35-115(b)(4), by itself, was not sufficient to sustain consecutive sentences. If the defendant is found to be a dangerous offender under the statute, the trial court must also determine whether the sentences imposed are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by the defendant, the "Wilkerson factors." Id. Moreover, trial courts must make specific findings regarding these factors before imposing consecutive sentences. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

In ordering consecutive sentencing, the trial court stated that the facts of this case were "chilling" and that the appellant "terrorized" the victims. The court also said,

> Unfortunately, the appellate judges were not able to see the victims on the stand, but their lives were forever altered by having to endure this ordeal brought upon them by Mr. Payne and his cohorts. And the cold, calculating manner in which he went in and put the gun to her head and demanded the keys from him and carried out this robbery, I think, would clearly establish him as a dangerous offender. . . . It would just not make a lot of sense to allow these to be served concurrently because he could go in - if things like this were to be served concurrently, then it would encourage individuals like Mr.

-11-

> Payne to identify larger numbers of people and get more proceeds from their conduct without any additional consequence. . . . So I think that as a matter of public policy, in addition to the fact that he's a dangerous offender . . . this would just about have to be served consecutively . . . .

The trial court's statements demonstrate that it believed consecutive sentencing reasonably related to the severity of the offenses. However, the trial court did not make the appropriate finding that consecutive sentencing was necessary to protect the public from further criminal activity by the appellant. In any event, consecutive sentencing was appropriate in this case because the record demonstrates that the appellant has an extensive criminal history. See Tenn. Code Ann. § 40-35-115(b)(2). The appellant's presentence report reflects that in addition to the current violent offenses, he has two prior felony convictions, two misdemeanor convictions, and was adjudicated delinquent in juvenile court. Moreover, the appellant admitted having an extensive past in the drug trade, selling cocaine since he was twelve or thirteen years old. We conclude that this history is sufficiently extensive to warrant the imposition of consecutive sentencing. See State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997) (stating that an extensive criminal history alone will support consecutive sentencing).

### III.  Conclusion

Based upon the record and the parties' briefs, we conclude that the appellant's aggravated robbery convictions in counts one and two must be merged and that his convictions in counts three and four must be merged. The judgments of the trial court are otherwise affirmed, and this case is remanded for the correction of the judgments consistent with this opinion.

_____
NORMA McGEE OGLE, JUDGE